**William H. TRAVER, Plaintiff-Appellee,**

**v.**

**David MESHRIY et al.,**
**Defendants-Appellants.**

**No. 77–2446.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 1979.

Decided Aug. 25, 1980.

Mark M. Garay, San Francisco, Cal., for defendants-appellants.

Ronald D. Foreman, San Francisco, Cal., for plaintiff-appellee.

Before GOODWIN and KENNEDY, Circuit Judges, and MURRAY,* District Judge.

KENNEDY, Circuit Judge:

Traver filed this action in federal district court against the Bank of America and two of its employees for their actions on April 15, 1975, in one of the Bank's San Francisco branch offices. The complaint alleged several causes of action, including: (1) deprivation of civil rights under 42 U.S.C. § 1983; (2) false imprisonment; (3) assault; (4) slander; and (5) intentional infliction of emotional distress. Jurisdiction was predicated on 28 U.S.C. §§ 1331 and 1343. The jury awarded Traver $4,500 in general damages and $52,500 in punitive damages. On appeal, the defendants contend that their actions were privileged, that insufficient evidence existed to support the verdict, and that the trial court erred in refusing to order a hearing to investigate possible juror misconduct.

We conclude that the pendent state claims were properly submitted to the jury and that the verdict is sustainable on the basis of those claims. We therefore affirm without addressing the question of whether recovery is sustainable on the federal claim.

* Honorable Frank J. Murray, United States District Judge for the District of Massachusetts, sitting by designation.

The jury could have found the following facts on the evidence presented to it. William H. Traver collects antique American clocks. Having learned that a clock he desired was to be sold on April 15, 1975, he visited a San Francisco branch of the Bank of America on April 14 to arrange withdrawal of the necessary funds during his morning coffee break the next day. Traver testified that, in response to his concern over possible problems with the anticipated withdrawal, bank operations officer Meshriy answered that the transaction would proceed smoothly so long as Traver submitted the proper identification.

The next day, April 15, Traver returned to the branch and presented to the teller a $352 state refund check and a slip to withdraw $648 from his Bank of America savings account at the Placerville branch in order to obtain $1,000 in cash. He also presented a savings account passbook showing a balance of $1,593, a driver's license, and a Bank of America courtesy card. The teller told Traver that the withdrawal was over the teller's approved limit, and that she would have to get approval from Meshriy, her supervisor.

Meshriy, who was engaged in a telephone conversation, told the teller to ask Traver for another signature and for his birthplace and mother's maiden name, in order to verify his identity. The second signature was requested because there allegedly was a discrepancy between the signatures on the withdrawal slip and other documents presented to Meshriy. The teller then checked with the Placerville branch, which verified that Traver's account was in order and contained sufficient funds. Placerville was unable, however, to locate any record of Traver's courtesy card.

As the teller was explaining this to Meshriy, Traver in a loud and irritated voice announced that he would be back in five minutes to get his money. Traver testified that he felt he was overextending his coffee break and was disgruntled over the inordinate amount of time the transaction was taking. He said he felt intimidated, and he spoke in a loud voice because the teller and Meshriy were at some distance from the teller's window. Traver then left the teller's window and headed for the exit, leaving his documents with the teller and Meshriy. At that point Meshriy called out to Timothy Gibson, an off-duty San Francisco police officer working as a teller at the branch, "Stop that man!" or "Stop that guy!" Gibson, whose primary responsibility was the bank's security, pulled his police identification card from his wallet and proceeded to the bank exit, where he intercepted Traver.

Identifying himself as a police officer, Gibson motioned Traver to a platform in the branch on which four bank employees' desks were situated, an area in view of the bank's customers, and instructed him to sit down. Traver complied but at several points inquired what was going on and protested that he was being detained. The incident was far from over, for it then occurred to Gibson that he had left his .38-caliber handgun at his teller's station and that he should go back to get it. While Meshriy approached to talk to Traver, Gibson retrieved the gun and returned to Traver, holding the gun. The parties dispute exactly how the gun was held, but Traver admitted at trial that it was not aimed or cocked.[1] In any event, after a few minutes, Gibson stationed himself, this time with his gun, near the bank exit where he had intercepted Traver.

Meshriy then called the Placerville branch himself, made a complete check of Traver's accounts, and decided to approve the transaction. After a heated exchange, Meshriy gave Traver the thousand dollars. Traver left, vowing that the bank would hear from him again. Approximately fifteen to twenty minutes elapsed between the time Traver was escorted to the platform and the time he left the bank.

---

1. Traver claims that Gibson held the gun "close to my head," while the bank insists that Gibson was at least five feet from Traver. There is also some dispute over whether Gibson touched Traver, the plaintiff claiming that Gibson pushed Traver back into his chair and told him to stay put when Traver attempted to get up to leave.

Traver, alleging sleeplessness, loss of appetite and psychological harm as a result of the incident, sued Meshriy, Gibson, the bank, and the City and County of San Francisco in federal court. He alleged false arrest, civil rights violations, assault, battery, slander, intentional infliction of emotional distress, and negligence by the City. The battery count and all counts against the city were dismissed.[2] The jury was instructed on the other counts and rendered a verdict in favor of Traver.[3] Judgment was entered and this appeal followed.

### Section 1983 Claim

■ At the outset we reject the appellants' contention that there was insufficient state involvement in Gibson's actions to render them "under color of state law." 42 U.S.C. § 1983. Gibson himself testified that he responded to Meshriy's call as a police officer rather than as a bank employee. Furthermore, it was established at trial that using off-duty police officers as "security tellers" at the bank was part of a police department "secondary hiring" program, and that the police department selected the officers for the program. An officer who had been instrumental in establishing the program testified that if an officer believed a crime had been committed, or was directed by a bank officer to stop an individual, his or her primary duty was to the department, not to the bank. Gibson flashed his police identification at Traver, moreover, and introduced himself as a police officer before instructing Traver to sit down on the platform. All these indicia of state action compel the conclusion that Gibson was acting "under color of state law" when he responded to Meshriy's call for help. See Griffin v. Maryland, 378 U.S. 130, 84 S.Ct.

1770, 12 L.Ed.2d 754 (1963); Stengel v. Belcher, 522 F.2d 438, 441 (6th Cir. 1975), cert. dismissed, 429 U.S. 118, 97 S.Ct. 514, 50 L.Ed.2d 269 (1976); Davis v. Murphy, 559 F.2d 1098, 1101 (7th Cir. 1977).

■ Traver, however, presented no independent evidence linking the Bank to Gibson's actions. The jury instructions appear to predicate the Bank's liability on the theory of respondeat superior. We find it unnecessary to reach the question whether or not the Bank is liable for acts of its employees in violation of section 1983. Traver alleged pendent tort claims against all defendants based on state law, and these claims are sufficient to sustain the judgment against both the Bank and its employees. Where more than one theory of recovery has been submitted to the jury in a civil case, and where on appeal it is claimed that as to one of the theories there was a lack of evidential support or an error of law in submitting the theory to the jury, the reviewing court has discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error. Adkins v. Ford Motor Co., 446 F.2d 1105, 1108 (6th Cir. 1971); Cross v. Ryan, 124 F.2d 883 (7th Cir. 1941), cert. denied, 316 U.S. 682, 62 S.Ct. 1269, 86 L.Ed. 1755 (1942); Berger v. Southern Pac. Co., 144 Cal.App.2d 1, 300 P.2d 170 (1956). In deciding whether to exercise this discretion, the reviewing court should determine the potential for confusion of the jury which may have resulted from an erroneous submission of a particular claim or cause of action, whether privileges or defenses of the losing party apply to the count upon which

---

**2.** The City and County of San Francisco was dismissed prior to trial on the ground that it was not a "person" under 42 U.S.C. § 1983. Although the Supreme Court subsequently has held that municipal corporations are persons within the meaning of section 1983, Traver has not raised the issue on appeal. See Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**3.** The jury returned the following verdicts: (1) against Gibson, $250 compensatory damages

and $1,000 punitive damages; (2) against Meshriy, $250 compensatory damages and $1,500 punitive damages; and (3) against the bank, $4,000 compensatory damages and $50,-000 punitive damages.

Prior to the verdict, the trial had denied defendants' motion for a directed verdict. After the verdict, the court denied motions for a judgment notwithstanding the verdict, for a new trial, for a remittitur, and for leave to examine the jurors regarding misconduct.

the verdict is being sustained so that they would have been considered by the jury with reference to the count, the strength of the evidence supporting the count being relied upon to sustain the verdict, and the extent to which the same disputed issues of fact apply to one or more of the theories in question.

We deem this an appropriate case to exercise our discretion to construe the general verdict as attributable to the state tort law theories of recovery. The instructions on those claims were correct, and there is ample evidence to support an award to the plaintiff based upon them. The section 1983 claim is all but derivative of the state torts alleged in the complaint and the facts bearing upon it are substantially the same. A jury finding of liability on a section 1983 claim would necessarily encompass a finding of liability on one or more of the state law claims, and state law provides for the employer's liability in this instance for the state torts committed by the employees in the scope of their employment. *See, e. g., Hinman v. Westinghouse Electric Co.*, 2 Cal.3d 956, 959, 88 Cal.Rptr. 188, 471 P.2d 988 (1970); *Rodgers v. Kemper Const. Co.*, 50 Cal.App.3d 608, 124 Cal.Rptr. 143 (1975); *Noble v. Sears, Roebuck & Co.*, 33 Cal. App.3d 654, 663, 109 Cal.Rptr. 269 (1973) (hirer of a detective agency for either a single investigation or for the protection of property may be liable for the intentional torts of employees of the private detective agency committed in the course of employment). The defenses of reasonable conduct and action taken in good faith were fully applicable to the state claims. We therefore construe the verdict to be attributable to the state tort law theories. If the pendent state claims against the Bank and Meshriy were retained by the federal court and submitted properly to the jury, we must affirm the judgment.

### Pendent Jurisdiction

■ If a federal claim against a party is dismissed before trial, the pendent state law claims should often be dismissed as well. *United Mine Workers v. Gibbs*, 383

U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Once a trial is held, however, this court will order dismissal of a pendent claim on remand only when the federal cause of action was so insubstantial and devoid of merit that there was no federal jurisdiction to hear it. If the federal claim was not frivolous, it was a matter of trial court discretion whether to hear the state claims against Meshriy and the Bank of America. *See Hagans v. Labine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1973).

■ The section 1983 claim asserted against the Bank was tenuous, but not frivolous. Though there is language in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which suggests that the doctrine of respondeat superior is not applicable to corporate entities in an action under section 1983, *Monell* dealt with the liability of municipal, not private corporations. The scope of corporate liability under section 1983 is still not at all clear. *See generally* Note, *Section 1983 Municipal Liability and the Doctrine of Respondeat Superior*, 46 U.Chi.L. Rev. 935 (1976). Prior to *Monell*, and at the time of trial in this case, the Tenth Circuit had held the question to be substantial enough to support federal and pendent jurisdiction. *Mendoza v. K-Mart, Inc.*, 587 F.2d 1052, 1056–57 (10th Cir. 1978). We conclude, therefore, in light of the nonfrivolous nature of the section 1983 claim, that the trial court did not abuse its discretion in refusing to dismiss the pendent state claims. We confine our inquiry now to whether recovery on those claims is supported by the law and evidence.

### Directed Verdict and Judgment NOV

■ Appellants assert that the district court erred in refusing to grant a directed verdict at the close of evidence and in denying a motion for a judgment notwithstanding the verdict. In determining whether to grant such motions, the district court must determine whether the evidence when

viewed most favorably to the party against whom the motion is directed cannot support a verdict in that party's favor. *See, e. g., Flores v. Pierce,* 617 F.2d 1386, 1389 (9th Cir. 1980); *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 732–34 (9th Cir. 1979); *Maheu v. Hughes Tool Co.,* 569 F.2d 459, 464 (9th Cir. 1977). We hold that the district court did not err in refusing to grant the defendants' motions.

Appellants contend that (1) insufficient evidence existed to support a verdict for the state tort claims and (2) the detention cannot support liability in any event because Traver consented to the stop and because the stop was privileged as a matter of law. These contentions are without merit.

Sufficient evidence existed to support a jury verdict in favor of Traver on the tort claims. Traver testified that Gibson pushed him into the seat and held a gun near his head, causing him to fear for his life. Even though the trial court held that Gibson had probable cause to stop Traver, the jury may reasonably have concluded that such conduct exceeded the reasonable force with which he was entitled to effect the detention.

Gibson contends that his actions were privileged as a matter of law and that Traver consented to the detention. First, Traver's testimony that he did not feel free to leave created a question of fact for the jury on the issue of consent. The jury could reasonably have concluded from Traver's testimony that he did not consent to the detention.

Gibson also asserts that the detention of Traver is subject to a qualified immunity under California's "shopkeeper's privilege." That doctrine authorizes private shopowners to detain for a reasonable time and in a reasonable manner for investigation any person whom the merchant had probable cause to believe had unlawfully taken or attempted to take merchandise from the premises. *See Cervantez v. J. C. Penney Co.,* 24 Cal.3d 579, 589, 595 P.2d 975, 980 (1979); *Collyer v. S. H. Kress & Co.,* 5 Cal.2d 175, 54 P.2d 20 (1936). The privilege is designed to allow proprietors to detain persons temporarily to determine whether they are absconding with store property. Assuming, without deciding, that the privilege did apply in these circumstances, it only permits detention for a reasonable time and in a reasonable manner. On this record a jury question existed on the issue of reasonableness.

Finally, appellants claim that Gibson's actions were protected by the defense of good faith and probable cause, which is available to a police officer in common law actions. Under California law, however, such a defense is not available to an off-duty police officer such as Gibson, who was acting in the scope of his employment as a private security guard. *See Cervantez v. J. C. Penney Co.,* 24 Cal.3d 579, 156 Cal.Rptr. 198, 595 P.2d 975 (1979); *People v. Corey,* 21 Cal.3d 738, 745, 147 Cal.Rptr. 639, 581 P.2d 644, 649 (1978). In such instances "the fact of private employment operates to prevent a peace officer from acting in what would otherwise be his official capacity." *People v. Corey,* 21 Cal.3d at 745, 147 Cal. Rptr. at 644, 581 P.2d at 649.

### Motion for New Trial

In determining whether to grant a new trial, the district court must decide whether, in its conscientious opinion, the verdict is clearly contrary to the weight of the evidence. *See Beverage Distributors, Inc. v. Olympia Brewing Co.,* 440 F.2d 21 (9th Cir.), *cert. denied,* 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); *Moist Cold Refrigerator Co. v. Lou Johnson Co.,* 249 F.2d 246, 256 (9th Cir. 1957), *cert. denied,* 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958). On appeal, this court will not disturb a verdict unless, viewing the evidence in a manner most favorable to the prevailing party, we can say that the trial

court abused its discretion. *Beverage Distributors, Inc. v. Olympia Brewing Co.*, 440 F.2d at 22–23; *Oswald v. Cruz*, 289 F.2d 488 (9th Cir. 1961). After careful review, we have determined that Traver presented substantial evidence to support each element of his pendent state claims, and the district court did not abuse its discretion in refusing to order a new trial.

### Hearing on Juror Misconduct

Shortly after the jury announced its verdict and was polled and discharged, counsel for both sides talked to individual jurors about the manner in which they arrived at the verdict. In moving for judgment notwithstanding the verdict or a new trial, defendants claimed that the jury verdict was not unanimous. Defense counsel stated that some jurors had told them that the jury had not unanimously agreed that defendants' conduct was willful and intentional. The district court refused defense requests to have the jurors recalled for a hearing on the question because defendants were unable to present any affidavits.

Appellants contend that the district court abused its discretion in denying a hearing on the jury verdict. This contention is meritless. Indeed, the court would have erred had it permitted inquiry into the jurors' deliberations and decision, by affidavits or otherwise.

In general, jurors will not be heard to impeach their verdict. *Holden v. Porter*, 409 F.2d 878 (10th Cir. 1969). This means particularly that juror affidavits or testimony will not be received concerning the manner in which the jury arrived at its verdict. *Parsons v. United States*, 188 F.2d 878, 879 (5th Cir. 1951). Because a verdict may not be impeached on the basis of the jury's internal deliberations or the manner in which it arrived at its verdict, the practice of counsel in propounding questions on these subjects to jurors after trial should be discouraged.

Once a verdict has been delivered and accepted in open court, and the jury is polled and discharged, jurors may not claim that their assent was mistaken or unwilling. *United States v. Chereton*, 309 F.2d 197 (6th Cir. 1962), *cert. denied*, 372 U.S. 936, 83 S.Ct. 883, 9 L.Ed.2d 767 (1963). Attacks on jury unanimity such as the one attempted here are also inappropriate after the jurors have assented to the verdict in a poll in open court. *United States v. Weiner*, 578 F.2d 757 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978).

One exception to the rule that jurors will not be heard to impeach their verdict has traditionally been recognized. Although jurors may not give evidence on their internal deliberations or decision, they may testify about the existence of any *extraneous* influence on the result reached. *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). This distinction is now codified in Fed.R.Evid. 606(b), which prohibits inquiry into the validity of a verdict except on questions of extraneous prejudicial information made known to jurors or outside influence brought to bear on them. *See United States v. Marques*, 600 F.2d 742 (9th Cir. 1979).

None of the appellants' allegations here concern extraneous information or outside influence that might have affected juror deliberations or the verdict. The district court's refusal to reopen the case to hear the evidence about the jury's internal deliberations was correct.

AFFIRMED.